**Jane DOE A, individually; John Doe, individually and as guardian for Jane Doe B, a minor, Plaintiffs,**

v.

**Jeremy GREEN, individually; Andre Denson, individually, J. Barkley, individually; Warran Hagman, individually; Clark County School District; Does I through X, and Roe Corporations I through X, inclusive, Defendant.**

No. CV–S–02–0055–LRH–PAL.

United States District Court, D. Nevada.

Jan. 2, 2004.

Julie Sanpei, Marc Cook, Cook & Kelesis, Las Vegas, NV, for Plaintiffs/Counter Defendant.

Vincent Consul, Dickerson, Dickerson, Consul & Pocker, Judith Kohl, Beckley, Singleton, Chtd., Las Vegas, NV, for Defendant.

## ORDER

HICKS, District Judge.

Presently before the Court is the Motion for Summary Judgment (Docket No. 72) filed by Defendants Clark County School District, Andre Denson ("Dr.Denson"), J. Barkley ("Ms.Barkley"), and Warran Hagman ("Mr.Hagman"). Plaintiffs filed an opposition (Docket No. 76) on April 8, 2003, to which Defendants subsequently replied (Docket No. 84). Oral argument was heard by the Court on December 9, 2003.

## BACKGROUND

This action is brought by minor Plaintiff Doe B (hereinafter "Doe") and her parents, John Doe and Jane Doe A ("Doe's parents") and arises out of the sexual seduction and molestation of Doe by a Clark County, Nevada public school teacher and sports coach. Plaintiffs' remaining claims include a cause of action brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C.A. § 1681(a), and various negligence claims. Defendants Clark County School District, Andre Denson, J. Barkley, and Warran Hagman move for summary judgment, arguing that Plaintiffs have failed to demonstrate the existence of any genuine issue of material fact to be tried, and that they are therefore entitled to judgment as a matter of law. Fed.R.Civ.P. 56.

In considering Defendants' motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir.1990). Plaintiff Jane Doe was a fourteen year-old ninth grade student during the 2000–2001 academic school year. She attended Mojave High School ("Mojave"), which was owned and operated by Defendant Clark County School District ("District"). Doe had a reputation for being a good student and was an active member of Mojave's soccer team, which was coached by head coach Kelly Michaels and Defendant Jeremy Green (hereinafter "Green"). As well as being the assistant soccer coach, Green was also a special education teacher at Mojave.

On Tuesday, November 21, 2000, Doe approached her health teacher, Cara Gresh, to confide in her about concerns she had regarding Green. Ms. Gresh immediately reported Doe's concerns to Mojave's Principal, Defendant Andre Denson ("Dr.Denson"). Ms. Gresh reported to Dr. Denson that Doe felt uncomfortable because of the way Green looked at her and what he said to her; that Green had asked Doe if she had a boyfriend; and that Green had called Doe at her home.

In response to the report by Ms. Gresh, Dr. Denson and an Assistant Principal, Defendant Ms. J Barkley ("Ms.Barkley"), met with Doe to discuss her concerns. During this conversation, Doe denied having ever stated that she felt uncomfortable around Green, and asked Dr. Denson if Green was in trouble. Dr. Denson continued to interview Doe, during which time she was asked if she and Green had ever had sex, ever kissed, or ever touched each other inappropriately. Doe stated that they had not. During this conversation, Doe continued to ask if Green was in trouble, or if what she said was going to get him into trouble. Doe did admit to Dr. Denson that Green had called her at her home, that he had paged the numbers "69" into Doe's beeper, and that he had told her about having a relationship with a former student. Whether during this meeting or at some other point, the record indicates it was also brought to Dr. Denson's attention that Doe had reported being told by Green that his relationship with this former student had been sexual, and that she had been fourteen years old at the time. Despite Doe's few admissions, Doe continued to deny that Green made her uncomfortable.

Plaintiffs allege that at some point on the same day as the meeting between Doe and Dr. Denson, Doe also expressed concern to one of Mojave's faculty, this time the head soccer coach, Ms. Michaels. According to the record, Doe told Ms. Michaels that she was afraid Green was going to make her do something that she did not want to do. She also said that she felt uncomfortable around Green because she felt that he liked her as more than a

friend, and she felt that he was pursuing her sexually. In addition to mentioning the conversation in which Green told her about having intercourse with a former student, Doe reported to Ms. Michaels that Green had asked Doe what boys were interested in her. He had stated that he asked this because he needed to know who his competition was. Doe also told Ms. Michaels that at one point Green had proposed a bet with her which would require her to kiss him as a penalty if she lost. Ms. Michaels then brought Doe's concerns to Dr. Denson. However, the record reflects that Dr. Denson's conversation with Ms. Michaels was very brief, and that he did not give her an opportunity to discuss what allegations had been made by Doe. Rather, he told Ms. Michaels that the problem had already been taken care of. At some point after his meeting with Doe, Dr. Denson then met with Green. Green admitted he had behaved inappropriately toward Doe in placing a phone call to Doe directly at her home. Green also admitted to discussing a relationship with a former student. Dr. Denson counseled Green to remain professional at all times and not communicate personal feelings to students. He also informed Green that he would ask the school's athletic director, Defendant Warren Hagman ("Mr.Hagman"), to meet with Green.

At some point, Doe's parents were alerted to the concerns that Doe had discussed with her teachers. The record reflects that Doe told her parents that Green had been making sexual innuendos in conversations with her, had been "touchy" with her, and had been inviting her to after-school activities. She informed them that Green also invited her into his personal vehicle to get a soft drink. During the brief car ride, Green brushed his hands against her bare knee and thigh.

Plaintiffs allege that Doe's father then met with Dr. Denson to discuss this information. During their conversation, Dr. Denson told Doe's father that he would monitor the situation and take care of the problem. Plaintiffs allege that Doe's father was told there would be an investigation, and Green would be given a letter of reprimand or counseling, and possibly suspended.

Per Dr. Denson's request, the athletics director, Mr. Hagman, eventually held a meeting with Green and Ms. Michaels. However, Plaintiffs allege that Mr. Hagman did not receive adequate information from Dr. Denson regarding the nature of the complaints against Green or the inappropriate conduct to which Green admitted. During the meeting, Mr. Hagman reviewed appropriate boundaries that the coaches were to keep with their student athletes. He then reduced this meeting to a memorandum form and distributed the memorandum to both coaches.

Neither Dr. Denson or Ms. Barkley referred the matter to officials, child and family services, or any police or sheriff's department. Plaintiffs allege that no attempts were made to monitor Green's behavior toward Doe on campus and that Dr. Denson never followed-up with Doe or visited with her again to see if she continued to have inappropriate interactions with Green.

Despite Doe's concerns, she continued to consider Green her "friend." Apparently, after the November 21st meetings with Dr. Denson, Doe and Green agreed that they would limit their interaction at school during the next couple weeks, to avoid arousing any suspicion. Then, on December 2, 2000, during a potluck social held at Ms. Michaels' house for the soccer team and their parents, Doe and Green secretly kissed for the first time. They told no one

about this kiss, and there were no witnesses.

Following the December 2nd kiss, Doe was in frequent contact with Green. She typically met Green for approximately ten minutes prior to school each day, as well as after school, between classes, and before and after soccer practice. During meetings between classes, Doe and Green would exchange letters kept in a notebook. Plaintiffs allege that Doe was also pulled out of her classes by a campus monitor, Adam Siqueiros ("Mr.Siqueiros"), at Green's request. During their time together on school grounds, Doe and Green engaged in kissing and fondling behind Green's locked classroom door. Doe and Green also began meeting off campus. At some point, Doe began to sneak out of her house in the middle of the night to meet with Green. Their relationship became sexual.

The record indicates that Doe's soccer coach, Ms. Michaels, was aware of the constant meetings between Doe and Green during school hours, and was concerned that those meetings were inappropriate. However, because she never caught them doing anything overtly wrong, and because Doe continued to tell Ms. Michaels, when questioned, that nothing was "going on," Ms. Michaels did not communicate her concerns or observations to the administration. Though the school had video cameras mounted in its hallways, no effort was made to use these devices to monitor Green.

On January 31, 2001, Doe's sister, who was also a soccer player, reported to Ms. Michaels that Green was massaging Doe's thigh, which had apparently been injured during a practice. Ms. Michaels approached Mrs. Gibson, an Assistant Principal, and told her of this. At this point she also described Green and Doe's frequent meetings.

Then, on February 2, 2001, the campus monitor, Mr. Siqueiros, came to Ms. Michaels' classroom and asked her who the appropriate person was to report that Green and Doe were having sex. Mrs. Gibson approached while Mr. Siqueiros was speaking with Ms. Michaels, and took over proceedings. The police were contacted about the sexual abuse.

On May 16, 2001, Green pled guilty to sexual seduction charges and to open and gross lewdness. Green was ordered to have no further contact with Doe. Despite this, the two continued their secret relationship until approximately mid-June 2001, when they were caught together in Green's car by the police. On July 18, 2001, Green was sentenced to a maximum term of sixty months and a minimum of twenty-four months.

Subsequently, Plaintiffs brought action against Green, Principal Denson, Assistant Principal Barkley, and athletic director Warran Hagman in their individual capacities, as well as against the Clark County School District, Does I through X, and Roe Corporations I through X. In the motion presently before the Court, Defendants contend that several of Plaintiffs' claims should not survive summary judgment.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) mandates entry of summary judgment if the pleadings and supporting documents, when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact...." See *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir.1990); *Palmer v. United States*, 794 F.2d 534, 536 (9th Cir.1986). In order to successfully rebut a motion for summary judgment, the plaintiffs must point to facts supported by the record which demonstrate a genuine issue

of material fact. *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736 (9th Cir.2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Id.* A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141 (9th Cir.1983).

## DISCUSSION

Defendants make several contentions in their Motion for Summary Judgment: (1) Plaintiffs cannot establish a claim under Title IX of the Educational Amendments of 1972; (2) Plaintiffs' claim for negligence under the reporting statute cannot survive summary judgment; (3) summary judgment should be granted as to all negligence claims brought by Doe's parents, Plaintiffs John Doe and Jane Doe A, as they are unable to provide evidence of any damages they've sustained; (4) Plaintiffs cannot establish a claim based upon Defendants' negligent failure to warn; and (5) Plaintiffs' claims for negligent hiring, retention, and supervision cannot survive summary judgment. Upon review of the record and relevant law, the Court makes the following disposition:

### I. Title IX Claim

■ The essence of Plaintiffs' claim under Title IX is that the sexual assault upon

Doe subjects the moving Defendants to civil liability for sexual harassment. Title IX of the Education Act of 1972, 20 U.S.C.A. § 1681(a), provides in pertinent part that:

> No person in the United States shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Although Congress only provided for administrative enforcement of Title IX's prohibition against discrimination, the Supreme Court held in *Cannon v. University of Chicago* that Title IX is also enforceable through an implied private right of action. 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560 (1979). In such an action, the injured party may seek money damages, but only to the extent that the plaintiff is able to show intentional discrimination on the part of the funding recipient itself. *See also Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

■ A teacher or other school employee's sexual harassment or sexual abuse of a student clearly constitutes discrimination under Title IX. *Franklin*, 503 U.S. at 75, 112 S.Ct. 1028.[1] However, in conformity with the above-stated principles, the Supreme Court has concluded that liability for a private right of action under Title IX will not lie merely because the plaintiff has experienced sexual harassment on school property. The scope of Title IX liability is purposely limited in order to eliminate any "risk that the recipient would be liable in

---

1. In *Franklin*, the Supreme Court stated:
 Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav.*

*Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student.
*Id.* at 75, 106 S.Ct. 2399.

damages not for its own official decision but instead for its employees' independent actions." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290–91, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Therefore, such liability is only appropriate for damages arising from the misconduct of the federal funding recipient in handling the problem of sexual harassment or abuse. *Davis v. Monroe County Board of Educ.*, 526 U.S. 629, 641, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

■ In *Gebser*, a case involving sexual abuse by a teacher, and *Davis*, a case involving student-on-student sexual harassment, the Supreme Court began to define the parameters of a school's liability for harassment under Title IX. Those two cases indicate that before the Defendant School District can be held liable for the conduct of Green, the Plaintiffs must establish: (1) That a school official, who at a minimum had authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf (2) had actual knowledge of the discrimination; and (3) that the school official's response failed to bring the violator into compliance and amounted to deliberate indifference to discrimination. *See Gebser*, 524 U.S. at 277, 118 S.Ct. 1989, and *Davis*, 526 U.S. at 633, 119 S.Ct. 1661. Defendants further contend that Plaintiffs must also prove that the behavior at issue is "so severe, pervasive, and objectively offensive, and so undermines and detracts from the [student's] educational experience, that the [student is] effectively denied equal access to an institution's resources and opportunities." *Id.* at 650, 119 S.Ct. 1661.

The parties do not dispute that the District is a recipient of federal education funding for Title IX purposes, nor is there an argument that any of the individually-named Defendants are not school officials with the authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf. Therefore, this Court will consider, respectively, whether there was actual knowledge of discrimination on the part of school officials; whether the response of the school officials—or lack thereof—amounted to deliberate indifference to discrimination; and whether the Plaintiff was consequently denied equal access to education.

*A. Actual Notice*

Though it is clear that "actual notice" is required under *Gebser*, the Court has not found any Ninth Circuit decision interpreting the contours of the *Gebser* notice requirement. Defendants argue that Plaintiffs cannot establish a Title IX claim against the school district because school officials did not have actual knowledge of the sexual abuse or harassment. The thrust of Defendants' argument is that during Doe's interview with Dr. Denson, she admitted only to three inappropriate instances of conduct on the part of Green, none of which rose to the level of harassment. Defendants do not attempt to provide a legal definition regarding what constitutes "harassment." However, this Court finds that such a determination is unnecessary due to the various disputed facts which concern this element of Plaintiffs' case.

According to the Defense, Defendants had actual knowledge of only three instances of inappropriate behavior: (1) Green had called Doe at home to check on her injury without first speaking with her parents; (2) Green shared with Doe the fact that he once had a relationship with a former student, who at the time of the relationship was over 18; and (3) Green had paged Doe, leaving the message " *69" on her pager as a joke. However, there is evidence in the record to support Plaintiffs' proposition that Defendants had actu-

al knowledge of other conduct complained of by Doe. Doe's health teacher, Ms. Gresh, reported to Dr. Denson that Doe had confided in her that she felt uncomfortable about the way Green looked at her and things he said to her, including asking her if she had a boyfriend. Dr. Denson and/or Ms. Barkley may also have been aware of a statement made by Doe that the "former student," with whom Green had once had a relationship, had been fourteen years old at the time. Green's relation of this information to Doe, who was herself fourteen, introduces an even more inappropriate and suggestive connotation to his conversations with her regarding his love life.

Plaintiffs also allege that Doe's father met with Dr. Denson to discuss several inappropriate actions which had been reported to him by Doe, namely that Green had been making sexual innuendos in conversation with her; Green had been "touchy" with her; and Green had invited her into his personal vehicle to get a soft drink and, during the car ride, had brushed his hands against her bare knee and thigh. Though the record is unclear as to the timing and order of Doe's discussions with her teachers, her parents, and Dr. Denson, it is obvious that Doe discussed her concerns separately to three different people who in turn reported the concerns to Dr. Denson.

Without citing any authority for this proposition, Defendants appear to argue that Doe's denials to Dr. Denson about a relationship with Green negate all of the above information regarding Green's conduct. Even setting aside the fact that Doe's denials were riddled with concern for whether Green was in trouble, Doe did admit to some inappropriate conduct. She also was apparently not questioned about all conduct allegedly reported to Dr. Denson, such as the car ride with Green, or sexual innuendos made by Green.

 The Court notes that other district courts across the country have considered the meaning of "actual notice" in the context of claims under Title IX. One court explained:

> Actual knowledge of intentional discrimination and actual knowledge of the actual plaintiff's experiences are two different things; requiring the latter imposes a substantially higher test than the former. Consistent with the majority of other courts, the Court thus finds that the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students.

*Johnson v. Galen Health Institutes, Inc.,* 267 F.Supp.2d. 679, 688 (W.D.Ky.2003).[2] Clearly, prior complaints made by the same student also provide actual notice,

---

**2.** In *Johnson,* the court noted that all district courts in the Sixth Circuit had taken the view that a school must merely "have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Id.* (citing *Folkes v. New York College of Osteopathic Med.,* 214 F.Supp.2d 273 (E.D.N.Y.2002); *Hart v. Paint Valley Local Sch. Dist.,* 2002 WL 31951264, *6–7, 2002 U.S. Dist. LEXIS 25720, * 22 (S.D.Ohio 2002); *Frederick v. Simpson College,* 149 F.Supp.2d 826 (S.D.Iowa 2001); *Crandell v.*

*New York College of Osteopathic Med.,* 87 F.Supp.2d 304 (S.D.N.Y.2000); *Gordon v. Ottumwa Comm. Sch. Dist.,* 115 F.Supp.2d 1077, 1082 (S.D.Iowa 2000); *Massey v. Akron City Bd. Of Educ.,* 82 F.Supp.2d 735, 744 (N.D.Ohio 2000); *Doe v. School Admin. Dist. No. 19,* 66 F.Supp.2d 57, 63 (D.Me.1999)). However, a minority view is expressed in *Baynard v. Malone,* 268 F.3d 228, 237–38 (4th Cir.2001), which held that the notice requirement in *Gebser* mandated a showing that the school district officials possessed actual knowledge of the discriminatory conduct in question.

even if the conduct complained-of was not identical to the conduct which the plaintiff alleges should have been remedied. *See Massey v. Akron City Board of Educ.,* 82 F.Supp.2d 735, 744 (N.D.Ohio 2000) (holding that "[f]or actual notice to exist, an agent of the school must be aware of facts that indicate a likelihood of discrimination."); *Frederick v. Simpson College,* 149 F.Supp.2d 826, 838 (S.D.Iowa 2001) (deciding that actual notice requires "actual notice . . . that [the teacher] was at risk of sexually harassing a student"); *Crandell v. New York College of Osteopathic Med.,* 87 F.Supp.2d 304, 320 (S.D.N.Y.2000) ("[T]he institution must have actual knowledge of at least some incidents of harassment in order for liability to attach . . . [and must have] possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based."). Moreover, a complaint of harassment need not be undisputed or uncorroborated before it can be considered to fairly alert the school district of the potential for sexual harassment. *See Gordon v. Ottumwa Cmty. School Dist.,* 115 F.Supp.2d 1077, 1082 (S.D.Iowa 2000) (holding that actual notice "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student. At some point . . . a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children."). In *Gordon,* the court explained:

> It is difficult to define what kind of notice is sufficient, but this Court agrees with a recent decision in the District of Maine in which that court stated actual notice "requires more than a simple report of inappropriate conduct" on the part of a school employee but "the . . . standard does not set the bar so high that a school district is not put on notice

until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Doe v. School Admin. Dist. No. 19,* 66 F.Supp.2d 57, 63 (D.Me.1999). At some point between these poles a supervisory school official knows, or it should be obvious to him or her, that a school employee is a substantial risk to sexually abuse children.

115 F.Supp.2d 1077, 1082 (S.D.Iowa, 2000). This Court concludes that the notice provided to the school district via Doe, her teachers, and her father, falls between these two poles mentioned in *Gordon:* though Doe's denials may cast a degree of doubt over the information disclosed to Dr. Denson by the adults in whom she had confided, the conduct complained of, considered in light of Doe's repeated disclosures, arises to "more than a simple report of inappropriate conduct." In considering notice given to a school official which was neither manifestly deficient nor "clearly credible," this Court is hesitant to determine as a matter of law that the school district was not put on actual notice. In *Hart v. Paint,* one district court held: "While the complaints may be unsubstantiated by corroborating evidence and denied by the allegedly offending teacher, whether such complaints put the school district on notice of a substantial risk to students posed by a teacher is usually a question for the jury." 2002 WL 31951264 (S.D.Ohio). This court agrees. If the Plaintiffs are able to prove their allegations concerning the reports made to the school district by Doe's teachers and Doe's father, this Court finds that a reasonable jury could conclude that those reports were sufficient to establish acts of sexual harassment of which school officials had actual notice.

### B. *Deliberate Indifference*

■ Having had actual notice, the school district is still not liable for Green's

sexual harassment and abuse of Doe unless its response to the known harassment amounted to "deliberate indifference to discrimination." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). If an institution "takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." *Wills v. Brown University*, 184 F.3d 20, 26 (1st Cir.1999) (citing *Gebser*, 524 U.S. at 291–92, 118 S.Ct. 1989). If, on the other hand, an institution either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination. *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989.

While there is little guidance in Ninth Circuit case law as to the meaning of "deliberate indifference" in Title IX claims, the standard itself is not unfamiliar to the courts. The deliberate indifference standard has been utilized in discrimination cases brought under § 1983 and Title VI. An overview of cases using the language of "deliberate indifference" shows that the standard is probably the same irregardless of the type of claim brought.[3] Therefore, in determining what is meant by the standard requiring "deliberate indifference," this Court will consider the standard as it has been described both in similar Title IX

claims, and in claims brought pursuant to other federal laws.

■ The Ninth Circuit has explained that a school district will be liable for discrimination occurring on school grounds "if the need for intervention was so obvious, or if inaction was so likely to result in discrimination, that it can be said to have been deliberately indifferent to the need." *Monteiro v. Tempe Union High School Dist.* 158 F.3d 1022, 1034 (9th Cir.1998) (discussing a school district's response to racial discrimination in a Title VI cause of action). *See also Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir.2001) (discussing liability under the deliberate indifference standard utilized for claims brought under § 1983). Deliberate indifference exists "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Reese v. Jefferson School District No. 14J*, 208 F.3d 736 (9th Cir.2000). In Nevada, the Ninth Circuit's civil jury instruction has been utilized to clarify the standard for a Title IX claim, defining deliberate indifference as "the conscious or reckless disregard of the consequences of ones acts or omissions." *Henkle v. Gregory*, 150 F.Supp.2d 1067 (D.Nev.2001) (citing 9th Cir. Civ. Jury Instr. 11.3.5 (1997)). None of these constructions, however, provide a bright-line by which this Court can determine wheth-

---

**3.** In *Gebser*, the Supreme Court case which first introduced the "deliberate indifference" standard to Title IX, the Court cited a § 1983 case in naming that standard. 524 U.S. at 291, 118 S.Ct. 1989 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–92, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), which held that inadequacy of police training may serve as basis for § 1983 municipal liability only where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact).

The Ninth Circuit later cited *Gebser*, a purely Title IX case, in holding that a school

district must be " 'deliberately indifferent' to its students' right to a learning environment free of racial hostility and discrimination" before it can be held liable under Title VI. *Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1034 (9th Cir.1998). After an extensive review of Ninth Circuit and Supreme Court case law on the deliberate indifference standard for claims brought pursuant to Title IX, Title VI, and § 1983, this Court has not uncovered any inconsistency in the text of the standard among these various claims.

er the Defendants' response to Doe's complaint was "clearly unreasonable." [4]

In determining whether liability exists, this Court notes the Ninth Circuit's history of leaving the question of deliberate indifference to the jury. *See Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir.1992) ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.") (citing *Davis v. Mason County*, 927 F.2d 1473, 1482 (9th Cir.1991)). *See also Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir.1994); *Blair v. City of Pomona*, 206 F.3d 938, 2000 WL 290246, *5 (9th Cir.2000); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir.2001); and *Perrin v. Gentner*, 177 F.Supp.2d 1115, 1124 (D.Nev. 2001). Yet none of the above cases were claims brought pursuant to Title IX, and this Court is not unaware that the United States Supreme Court has expressly held that in an "appropriate case," a district court could find that a school district's response was not "clearly unreasonable" as a matter of law. *Davis Next Friend La-*

*Shonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649, 119 S.Ct. 1661, 1674, 143 L.Ed.2d 839 (1999).[5]

 However, the Court concludes that this is not an appropriate case. Other district courts have found that the deliberate indifference or clearly unreasonable standard "does not lend itself well to a determination by the Court on summary judgment," and have permitted the claim to go to the jury if the plaintiffs advanced some evidence in support. *Hart v. Paint Valley Local School Dist.*, 2002 WL 31951264, *9 (S.D.Ohio). Similarly, this Court finds that, in considering the facts in the light most favorable to Plaintiffs, a reasonable jury could find the Defendants' conduct constituted deliberate indifference.

## C. Denial of Equal Access to Education

Finally, Defendants argue that Plaintiffs cannot make out a claim under Title IX because such a claim requires proof that the harassment had a "concrete, negative effect" on the victim's education such that she was effectively denied equal access to

4. Reviewing cases outside this Circuit, it is clear that most courts have similarly not discovered such a bright-line. *See, e.g., Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir.1997) ("Actions that in hindsight are 'unfortunate' or even 'imprudent' will not suffice."); and *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994) ("deliberate indifference describes a state of mind more blameworthy than negligence" but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). The Eighth Circuit provides an exception: In *Kinman v. Omaha Pub. Sch. Dist.*, the court found that the school district "did not turn a blind eye and do nothing," and therefore was not deliberately indifferent. 171 F.3d 607, 610 (8th Cir.1999). This suggests that in some jurisdictions, a school district will not be considered deliberately indifferent so long as it has responded in some way to a complaint. Such a standard, howev-

er, has been rejected in other circuits. *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 261 (6th Cir.2000) (expressly rejecting the school district's contention that as long as it had done "something" in response to the harassment of a student, it had satisfied the standard). In *Vance*, it was held that "[s]uch a minimalist response is not within the contemplation of a reasonable response." *Id.* at 260. This Court agrees. Permitting a school district to avoid liability on the basis of some minimalist and ineffective response to discrimination would be inconsistent with the Supreme Court's ruling that responses which are "clearly unreasonable" constitute deliberate indifference.

5. "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

education. *Davis*, 526 U.S. at 652–653, 119 S.Ct. 1661. Defendants argue that there is no evidence that Doe was denied access to an education as she continued to attend the same school, her grades remained steady, and she continued to remain a good player in the sports teams with which she was involved.

Defendants refer to the *Davis* court ruling that, before a school district can be found liable for student-on-student harassment, plaintiffs must show that the behavior at issue was "so severe, pervasive, and objectively offensive, and... so undermine[d] and detract[ed] from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Id.* at 633, 119 S.Ct. 1661. This Court is not convinced that the *Davis* adoption of this requirement was ever meant to apply to cases involving sexual abuse by a teacher, as the *Davis* court appears to limit its holding. *Id.* at 633, 119 S.Ct. 1661.[6] Indeed, the reasoning stated by the *Davis* court is inapplicable to cases of teacher-student harassment: "By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Id.* at 653, 119 S.Ct. 1661. Immediately following this rationale, the Court explains:

The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment.

*Id.* at 653, 119 S.Ct. 1661

*Davis* clearly distinguished student-on-student harassment from the harassment of a student by a teacher. More importantly, in *Gebser*, which involved a similar situation of consensual sexual relations between a teacher and his ninth-grade student, the Supreme Court expressly recognized "...that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system." *Gebser*, 524 U.S. at 292, 118 S.Ct. 1989.

This Court notes that Defendants provide examples of behavior, such as dropping grades, becoming homebound, or hospitalization, that other courts have found to be indicators that harassment has had a severe effect on a student's educational experience. However, the Defendants examples are pulled from cases involving student-on-student harassment.[7] The Defendants have not provided any authority, and the Court's independent research has not

---

**6.** "We consider here whether a private damages action may lie against the school board in cases of student-on-student harassment. We conclude that it may, but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities. Moreover, we conclude that such an action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the vic-

tim's access to an educational opportunity or benefit." *Id.*

**7.** See, e.g., *Murrell v. School Dist. No. 1, Denver Colo.*, 186 F.3d 1238, 1248 (10th Cir. 1999); *Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253 (6th Cir.2000); *Gabrielle M. v. Park Forest–Chicago Heights, Ill. School*, 315 F.3d 817 (7th Cir.2003).

uncovered any, requiring a showing that a student was denied equal access to education in the context of a claim alleging the sexual abuse of a student by a teacher.

▆▆▆ Notwithstanding this observation, the Court concludes that Green's sexual abuse of Doe, both on and off school campus, did have a "concrete, negative effect" on Doe's education. In stating that sexual abuse by a teacher "undermines the basic purposes of the educational system," the Supreme Court undoubtedly refers to the immense trust placed in school employees to keep students safe and to maintain an environment and relationship conducive to learning. A violation of this trust through such extreme means as engaging in sexual relations with a child-student, exposes that student to a harm so "severe, pervasive, and objectively offensive"—not to mention lasting, grievous, and potentially debilitating—that it cannot be said that this victim has equal access to the educational experiences offered at the institution. To the contrary, that student has been denied the security that is fundamental to accessing the institution's resources and opportunities.

The Court is unable to make a finding of law in favor of Defendants as to any element of Plaintiffs' claim under Title IX. Consequently, summary judgment is not warranted on this claim.

## II. Claim for Negligence Under the Reporting Statute

Defendants next request the Court to grant summary judgment on Plaintiffs' claims for negligence under the reporting statute. The standard for granting summary judgment in a negligence action requires this Court to determine whether a factual dispute exists with regard to each element of the cause of action: (1) duty; (2) breach; (3) actual causation; (4) legal causation; and (5) damages. *Sims v. Gen-* *eral Telephone & Electronics*, 107 Nev. 516, 815 P.2d 151 (1991) (citing *Perez v. Las Vegas Medical Center*, 107 Nev. 1, 805 P.2d 589 (1991)).

Nevada Revised Statute § 432B.220 requires certain individuals to report child abuse within 24 hours if they know or have reasonable cause to believe that a child has been abused or neglected. Plaintiffs argue that, based on the duty established by this statute, the School District and individual defendants were negligent in failing to report the conduct of Green which was brought to their attention by Ms. Gresh, Ms. Michaels, Doe, and Doe's father. Defendants do not dispute that they are required by law to report the abuse or neglect of a child. However, Defendants assert that there was no duty to report because the conduct of which they were aware did not constitute "abuse."

▆▆▆ Abuse is defined as: (1) Physical or mental injury of a nonaccidental nature; (2) Sexual abuse or sexual exploitation; or (3) Negligent treatment or maltreatment (as defined in other subsections). Nev. Rev.Stat. 432B.020. Among the many illegal acts defined as constituting sexual abuse, *see* Nev.Rev.Stat. § 432B.100, is the "annoyance or molestation of a minor." This Court concludes that there is a material issue of fact as to the extent of the knowledge school officials had of Green's conduct. Moreover, on the basis of the evidence favorable to Plaintiffs, a reasonable jury could conclude that school officials failed to report the "annoyance or molestation of a minor" as required by statute. Summary judgment therefore cannot be granted on this claim.

## III. Negligence Claims Alleged by Doe's Parents

Defendants next contend that summary judgment should be entered as to all negli-

gence claims brought by Doe's parents. In their complaint, Doe's parents asserted claims on behalf of their daughter and claims in their individual capacity. The Court has previously dismissed the individual capacity claims by Doe's parents for negligent and intentional infliction of emotional distress. Due to ambiguities in Plaintiff's complaint, the Court requested clarification at oral argument concerning any additional claims sought to be pursued by the parents in their individual capacities. None has been provided and the Court concludes that the parents have not asserted any other individual capacity claims. Defendants' challenge to any such claims will, therefore, be DENIED as moot.

## IV. Negligent Failure to Warn Claim

Next, Defendants argue that Plaintiffs' claim against Defendants, alleging a negligent failure to warn, should not survive summary judgment because Plaintiffs have failed to offer any evidence which would constitute such a claim.

The standard for a negligent failure to warn claim is clear: liability will only exist where there is a special relationship between the parties, and the danger is foreseeable. *Sims v. General Telephone & Electronics,* 107 Nev. 516, 521, 815 P.2d 151, 154 (1991); *Wiley v. Redd,* 110 Nev. 1310, 1316, 885 P.2d 592, 596 (1994). With regard to the latter requirement, Plaintiffs assert that Green's application with the district omitted past work experience which should have been discovered and explored. Plaintiffs argue that "[t]he issue of whether or not District acted appropriately in investigating Green prior to hiring is relevant for determining whether evidence regarding Green's potential danger to students should have been discovered prior to his hiring." However, Plaintiffs do not explain the relevance of this issue to

the question of whether Defendants failed to warn Plaintiffs of a known danger. It appears that Plaintiffs are attempting to assimilate their claim for negligent hiring into this claim for failure to warn. It is not surprising that Plaintiffs cite no authority for their position, because if the Court considered whether Defendants negligently hired Green as an element of this claim, the Court would effectively disassemble the foreseeability requirement which is clearly an element of a failure to warn claim.

The Court has not uncovered any case imposing a duty to warn on an individual or entity who was not aware of an actual risk of harm. Had the school district or school officials actually been aware of reasons to suspect Green, then the Defendants would have been required to take reasonable precautionary measures, depending on the gravity of the possible harm. *Ducey v. United States,* 830 F.2d 1071, 1072 (9th Cir.1987). Here, Plaintiffs are unable even to allege that the Defendants realized Green's omission and ignored it. Because Defendants were not aware of any reason to suspect Green, the risk of harm to Doe was not foreseeable, and Plaintiffs' claim for negligent failure to warn cannot survive summary judgment.

## V. Negligent Hiring, Retention, and Supervision Claim

Defendants' final contention is that Plaintiffs' claim of negligent hiring, retention, and supervision must not survive summary judgment because Plaintiffs have offered no evidence that the school district either knew or should have known of Green's dangerous propensities.

An employer has a duty to use reasonable care in the hiring, supervision, and retention of an employee. *Hall v. SSF, Inc.,* 112 Nev. 1384, 930 P.2d 94 (1996), *Burnett v. C.B.A. Security Service,*

*Inc.,* 107 Nev. 787, 820 P.2d 750, 752 (1991). In the case of negligent hiring, a general duty is imposed on the employer "to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position." *Id.* at 789, 820 P.2d 750; *Hall v. SSF, Inc.,* 112 Nev. 1384, 1392, 930 P.2d 94, 98. Plaintiffs argue that they have presented a material issue of fact as to the reasonableness of the background check conducted by the School District during Green's application process. However, in order to survive summary judgment, there must be factual disputes as to all elements of a negligence claim, including actual causation. *See Riley v. OPP IX, L.P.,* 112 Nev. 826, 830, 919 P.2d 1071, 1074 (1996). Plaintiffs allege that the School District did not contact Green's personal references, discover omissions on his application, or conduct a thorough background check. However, there is no evidence that, had the School District done these things, it would have uncovered prior conduct indicating that Green was unfit for a teaching or coaching position.

Consequently, Plaintiffs will not be permitted to pursue a claim of action premised on the theory that the School District negligently hired Green. However, Plaintiffs may continue to pursue Doe's negligence claim against the District based on negligent retention and supervision as the Defendants have not challenged this portion of Plaintiffs' complaint.

## CONCLUSION

Based on the foregoing, it is ORDERED that Defendants' Motion for Summary Judgment (Docket No. 72) is GRANTED IN PART AND DENIED IN PART, as follows:

It is ORDERED that Plaintiffs' negligence claim for failure to warn is dismissed;

It is further ORDERED that Plaintiffs' claim for negligent hiring is dismissed.

This Court confirms that it has previously dismissed the claims for negligent and intentional infliction of emotional distress brought on behalf of Doe's parents.

In all other respects, Defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

## ORDER

Before the Court is Plaintiffs' Motion for Finding Regarding District's Respondeat Superior Liability for Green's Actions Against Doe B (Docket No. 74), filed March 21, 2003. Defendants filed an opposition and counter motion for the same (Docket No. 78) on April 8, 2003, to which Plaintiffs subsequently replied (Docket No. 83). Both parties request this Court grant summary judgment regarding whether the Defendant School District is subject to respondeat superior liability for the assault and battery of Doe B by the School District's employee, Defendant Green. Upon review of the record and consideration of the relevant law, this Court makes the following disposition:

▪ A lengthy history of Nevada state common law holds employers vicariously liable for the tortious conduct of their employees if the employee was acting within the scope of his employment at the time he engaged in the offensive conduct. *See, e.g., National Convenience Stores v. Fantauzzi,* 94 Nev. 655, 659, 584 P.2d 689, 692 (1978); *Hallett v. United States,* 877 F.Supp. 1423, 1427 (D.Nev.1995). Generally, whether an employee was acting within the scope of his or her employment for the purposes of respondeat superior liability is a question to be determined by the trier of fact. *Evans v. Southwest Gas Corporation,* 108 Nev. 1002, 1005, 842 P.2d

719, 721 (1992). However, where undisputed evidence exists concerning the employee's status at the time of the tortuous act, the issue may be resolved as a matter of law. *Id.* As there is no material dispute as to when and where the various instances of inappropriate contact occurred between Doe and Green, this case is ripe for such a determination.

In *Nevada Dept. of Human Resources, Div. of Mental Hygiene and Mental Retardation v. Jimenez*, the Nevada Supreme Court carefully delineated the parameters of respondeat superior liability, which clarified but did not significantly depart from the voluminous prior holdings. 113 Nev. 356, 935 P.2d 274 (1997). However, Defendant's opposition points out that the Nevada Revised Statutes also address this issue. The relevant statute states in part:

1. An employer is not liable for harm or injury caused by the intentional conduct of an employee if the conduct of the employee:

(a) Was a truly independent venture of the employee;

(b) Was not committed in the course of the very task assigned to the employee; and

(c) Was not reasonably foreseeable under the facts and circumstances of the case considering the nature and scope of his employment. For the purposes of this subsection, conduct of an employee is reasonably foreseeable if a person of ordinary intelligence and prudence could have reasonably anticipated the conduct and the probability of injury.

Nev.Rev.Stat. § 41.745. In asserting that this statute was adopted in 1997 in response to the *Jimenez* case, the Defense apparently argues that the statute marks a change in Nevada law. After conducting its own legal research,[1] this Court finds that the Defense's conclusion is without merit as the language of the statute does not differ significantly from the Nevada Supreme Court's ruling in *Jimenez* or prior cases. For instance, the *Jimenez* Court explains that "[i]f the employee's tort is truly an independent venture of his own and not committed in the course of the very task assigned to him, the employer is not liable." 113 Nev. at 364, 935 P.2d 274 (citing *Prell Hotel Corp. v. Antonacci*, 86 Nev. 390, 391, 469 P.2d 399, 400 (1970)). The Court also emphasizes that the tortious conduct must be generally foreseeable "in the context of the particular enterprise." *Id.* at 365, 935 P.2d 274. Though stated differently, the foreseeability test described in *Jimenez* reflects the same policy rationale apparent in the statute's requirement that a "person of ordinary intelligence and prudence could have reasonably anticipated the conduct and the probability of injury." The *Jimenez* Court required that "in the context of the particular enterprise an employee's conduct [must not be] so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* Consequently, it is clear that the Nevada statute does not require the utilization of a standard foreign to that applied in Nevada case law addressing respondeat superior liability. This Court will therefore review the requirements imposed by the statute in a

---

1. Though many Nevada state and federal cases develop the issue of respondeat superior liability prior to the adoption of this statute, since 1997 relatively few cases have addressed the issue. The few cases uncovered by this Court which do discuss an employer's vicarious liability have not mentioned the statute or indicated that the statute signaled any change in Nevada law. *See, e.g., Switzer v. Rivera*, 174 F.Supp.2d 1097 (D.Nev.2001) and *Burns v. Mayer*, 175 F.Supp.2d 1259 (D.Nev.2001).

manner which conforms to the Nevada common law.

Initially, it is clear to this Court that several of the tortuous acts which Green allegedly committed did occur within the course and scope of Green's employment and were reasonably foreseeable. Though Green was obviously not hired to molest, abuse, or threaten minors, the *Jimenez* Court explains that "the proper inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal." *Id.* at 368, 935 P.2d 274 (internal citations omitted). In a case with similar facts, one district court noted that the Nevada Supreme Court had held that a blackjack dealer who slugs a patron is acting within the course of the very task assigned. *Doe v. Estes*, 926 F.Supp. 979, 989 (1996) (citing *Prell Hotel Corp. v. Antonacci*, 86 Nev. 390, 469 P.2d 399 (1970)). The court then added:

> This court fails to discern any principled legal distinction between a battery claim against a casino whose blackjack dealer slugs a patron and the same claim against a school district whose teacher fondles a student. In both cases the plaintiff was on the defendant's premises for the purpose of enjoying the defendant's services. In neither case can it reasonably be argued that the employee's duties included acts of common law battery.

*Id.* The holding in *Doe v. Estes* is consistent with numerous Nevada cases finding that an employer is liable for the sexual misconduct of his employee when that conduct occurs in the workplace. For instance, in *Jimenez* the court found that the sexual assaults, committed upon children placed in a group home by the home's supervisor, were foreseeable. 113 Nev. At 361. Moreover, these acts were not a substantial deviation from the employee's duties "for purely personal reasons... because the sexual assaults were committed during a series of acts authorized by the State." *Id.* In *Ray v. Value Behavioral Health, Inc.*, the court found that a psychologist's sexual harassment of his client exposed the counseling firm to liability for its employee's acts. 967 F.Supp. 417 (D.Nev.1997). The Court concluded that the psychologist's abuse of his power was foreseeable, and that the acts were committed in the course of a series of acts ... authorized by the principal. *Id.* at 421–22.

 Consequently, it is apparent that the School District is liable for intentional torts committed by its employees during their employment, even if it is clear that those acts were not authorized by the School District. In the instant case, Green was authorized by the School District to monitor and instruct the students attending the school during school hours, and to supervise and coach those students who participated in the school-sanctioned athletic activities. The authority vested in Green permitted him to direct and discipline students, to meet privately with students in his office, to pull students out of other classes, and to have other substantial contact with students at his discretion. Therefore, this Court concludes that the Defendant School District is subject to respondeat superior liability for the tortuous acts committed by Green at those times in which he was engaged—or should have been engaged—in his duties as an instructor and athletics coach of the school.

██ However, the School District cannot be held liable for tortuous conduct Green committed while he was not working—to hold otherwise would be to disregard the statutory rule and case holdings which emphasize that the employee must be engaged in the "very task" assigned by the employer at the time the tort is com-

mitted. Therefore, this Court concludes conduct that did not occur in the course of acts authorized by the School District are outside of the course and scope of Green's employment and cannot subject the School District to liability.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Finding Regarding District's Respondeat Superior Liability for Green's Actions Against Doe B (Docket No. 74), and Defendant's counter motion for the same, are GRANTED in-part and DENIED in-part as set forth in this order.

IT IS SO ORDERED.